## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| JAMES BOLTON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 04-2156-CM** |
| | ) | |
| SPRINT/UNITED MANAGEMENT | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff James Bolton brought this case against defendant Sprint/United Management Company on April 13, 2004, alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 60) and defendant's Motion to Strike Declaration of Stephen J. Dennis (Doc. 70). For the reasons set forth below, the court grants defendant's motions.

## I.      Motion to Strike

Plaintiff's counsel, Stephen J. Dennis, submitted an affidavit in support of plaintiff's response to the pending summary judgment motion. Defendant has moved to strike Mr. Dennis' affidavit, alleging that the information contained within the affidavit was obtained through discovery in an unrelated case, and that the information is subject to a protective order in the unrelated case. Plaintiff did not respond to defendant's motion.

Pursuant to Local Rule 7.4, "[i]f a respondent fails to file a response within the time required by Rule 6.1(d), the motion will be considered and decided as an uncontested motion, and ordinarily

will be granted without further notice." Because the time for response to defendant's motion to strike

is long past, the motion is uncontested, and the court hereby grants defendant's motion. The court

has not considered Mr. Dennis' affidavit in making its summary judgment ruling.

**II.    Facts[1]**

    **A.    Defendant's Structure and Plaintiff's Employment**

Plaintiff was born on February 5, 1953. Plaintiff began working for defendant's predecessor

on August 31, 1987, as a software engineer II ("SE II") in the information technology division. In

1990, plaintiff began working part time on the Access Request Management System ("ARMS").

ARMS is an on-line system that field representatives use to enter service requests. Plaintiff and other

software engineers on the ARMS team were responsible for maintaining existing business

functionality and developing enhancements. Plaintiff began working on the ARMS team full time in

1993 and remained as a full time member of the ARMS team through the end of his employment with

defendant.

Until March 2003, a manager within defendant's organization directly supervised the ARMS

team. The manager reported to a director. Betty Mathis managed the ARMS team from

approximately 1995 to 1997. Plaintiff received an overall performance rating of 2 (above

expectations) in 1994. Mathis promoted plaintiff to a software engineer III ("SE III") in 1995.

Mathis testified that she promoted plaintiff against her better judgment. Plaintiff did not receive any

other promotions during his employment with defendant and remained an SE III until his termination.

_____

[1]The court construes the facts in the light most favorable to plaintiff as the nonmoving party
pursuant to Fed. R. Civ. P. 56.

Gene Geiselman managed the ARMS team from 1997 until March 1998.  Sue Goodwin[2] managed the ARMS team from March 1998 through the end of plaintiff's employment.  Goodwin reported to Mike Norton, who was a director when Goodwin became manager of the ARMS team.

In March 2003, defendant added another layer of supervision on the ARMS team, and Matt Stranimier and Shelly Becker became supervisors of the team.  Software engineers IV ("SE IV") and below directly reported to either Stranimier or Becker and indirectly to Goodwin.  Software engineer V's ("SE V") still reported directly to Goodwin.  Becker was plaintiff's supervisor from approximately March 2003 to early August 2003, when Becker left the ARMS team.  Stranimier was plaintiff's supervisor from early August 2003 until the end of plaintiff's employment.

While plaintiff was on the ARMS team, projects were overseen by team leads.  The team leads for ARMS were Dennis Beach, Larry Reeves, Pat Mitchell, Stranimier and Becker.[3]

Each project assigned to the ARMS team had a budget.  Employees on the ARMS team were required to record their time on projects so that the business unit which had requested the service could monitor the cost of the project.  Plaintiff was aware of this requirement and signed documents several times stating this awareness.  If a project looked like it would go over budget, the ARMS team manager was required to notify the business unit that had made the request and explain the variance.  If the business unit decided to go forward with the project, the manager issued a change request, and the business unit provided more funding.  Plaintiff understood that recording time spent on specific projects affected the budget, defendant's bottom line, project planning and management reporting.  However, plaintiff contends that he was never informed, either verbally or in writing, that any business unit had to increase its budget as a result of any of his acts.

---

[2] Goodwin was born on May 9, 1961.

[3] Larry Greenwood, Paul Robinson, Michael Starbuck and David Preston were not team leads.

**B.**     **Defendant's Performance Appraisal Process**

Defendant's performance appraisal process is called LINK.  This process was in place when plaintiff reported directly and indirectly to Goodwin.  The LINK process begins with a performance planning discussion between the employee and his manager.  Twice during the year, the employee and manager meet to discuss the employee's progress.  The employee completes documentation of the interim review.  At the end of the performance year, the employee completes the LINK form for the year, which identifies accomplishments and opportunities.  The employee's supervisor assesses the employee's performance and accomplishments and then assigns a LINK performance rating.  The final LINK form has a place for the manager's comments.

From 1990-1998, plaintiff received formal ratings from managers other than Goodwin as follows: 1990-1993 – proficient; 1994 – above expectations; 1995-1996 – fully satisfactory; and 1997-1998 – fully met expectations.  Plaintiff received pay increases in years 1990 to 1998.

Other than the comments in the box and the signatures, none of the information on plaintiff's LINK's for 1999 – 2002 was provided by Goodwin.

During 2000, managers assigned to employees a LINK rating from the following categories: 1 – greatly exceeds expectations; 2 – exceeded expectations; 3 – fully met expectations; 4 – below expectations; and 5 – unacceptable.  During 2000 and 2001, most employees received a 3 rating.  Employees usually received a 2 rating the year before a promotion.

Defendant required a fair amount of documentation to support a 4 rating.  Thus, many managers were reluctant to assess performance at this level because they would have been expected to implement a performance improvement plan.  For many years, the culture at defendant was that ratings below 3 were rarely given.

On the ARMS team, Norton managed the performance of his least effective performers by documenting performance gaps within the manager's comments section of the LINK form rather than indicating the employee's performance issues by numeric rating. Norton had spent many years in a culture where it was standard to retain employees for the long term so long as the employees put forth effort.

During this time period, defendant began to focus on efficiency. Human resources had concerns about the LINK rating system and that managers were not effectively differentiating or identifying top performers. Defendant implemented a new performance rating system during performance year 2001 in order to better identify top performers. For 2001, employees officially received a rating under the old LINK system, but their supervisors also informed them of an advisory rating under the new system. The advisory rating was intended to communicate to employees where they would have fallen under the new rating system. The advisory ratings were: M – most effective; H – highly effective; E – effective; I – improvement needed; and S – substantial improvement needed. Human resources recommended that a certain percentage of employees under each director receive the new ratings as follows: M – 10%; H – 20%; E – 40%; I – 20%; and S – 10%.

For performance year 2002, managers assigned ratings to their employees on their final LINK as follows: M – most effective; H – highly effective; V – very effective; and L – less effective. For that year, managers and directors referenced guidelines that indicated percentages of employees under each director that should fall into each rating category.

**C.**     **Defendant's Corrective Action Process**

Under defendant's corrective action guidelines which were in place during plaintiff's employment, stages of counseling and corrective action could include a verbal warning, written warning, final written warning, and/or termination of employment.  Defendant's corrective action guidelines provided that a written warning could be in effect for three to nine months, and a final written warning could be in effect for three to twelve months.  Defendant's corrective action guidelines also provided that time frames for improvement would be based on individual circumstances, that the stage of counseling or corrective action applied would be based on the individual situation and issues being addressed, and that management retained the discretion to place an employee in any stage of the corrective action process appropriate for the situation, including immediate termination.  The corrective action guidelines directed managers to human resources for assistance.  Plaintiff was not placed on corrective action at any time between 1987 and 2002.

**D.      Plaintiff's Performance Between 1996 and May 2003**

As of 1996, plaintiff had been working on the ARMS team for six years.  For performance year 1996, plaintiff's supervisor, Betty Mathis, gave plaintiff a "fully satisfactory" rating overall. Mathis rated plaintiff as "improvement needed" in the specific areas of leadership, management, and personal effectiveness.  In the comments section of the appraisal, Mathis noted: "[Plaintiff] has not done much leading, but needs to enhance his technical skill set in order to gain the confidence of other team members.  He is enthusiastic and positive in all areas."

Mathis prepared notes for the appraisal meeting that state the following:

Strengths

His desire or dedication to his job.

Willingness to perform tasks which others do not want to perform (i.e. alert distribution).

Weaknesses

Has a difficult time grasping new tasks/assignments.

He's slow.  It seems to take [plaintiff] longer than average to perform a task.

Very weak analysis skills.

Even though he as [sic] been on ARMS a number of years, he lacks understanding of some basic business functions of the system.

Either he is very conservative or he lacks self-confidence in his decision making skills.

Although plaintiff disagreed with the comments by Mathis, Mathis contends that the notes accurately reflect her assessment of plaintiff's performance during the time she supervised him.

On January 7, 1999, Goodwin, then plaintiff's supervisor, met with plaintiff to discuss his performance.  Plaintiff reviewed a memo that Goodwin prepared in connection with the meeting. Goodwin informed plaintiff that he was not performing at the level of a SE III.  Goodwin pointed out that plaintiff, having been on the ARMS team for several years, was expected to provide technical guidance to less experienced SEs.  Goodwin noted that plaintiff required assistance from others to resolve most production issues and could resolve issues on his own only if they were known and documented.  Plaintiff disagreed with Goodwin's assessment and comments about his performance. Goodwin also noted that plaintiff tried very hard, and was a dedicated employee who was never late for work and was rarely absent.  Goodwin noted that plaintiff was well-liked by his team members and a team player although his efforts to assist his team, though sincere, were not efficient.

On January 8, 1999, Goodwin told plaintiff that she planned to rate him a 4 for performance year 1998.  However, after discussions with her director, Norton, Goodwin formally rated plaintiff a 3 for performance year 1998.  Plaintiff did not receive a merit pay increase in 1999.

In the following years, Goodwin obtained feedback from project leads regarding plaintiff's performance.  On April 30, 1999, ARMS team leader Larry Reeves[4] sent an e-mail to Goodwin containing the following statements about plaintiff:

1.    He did not readily know the difference in the 16th position of the ASR number, which anyone with over a year's experience should know.

2.    He took 163 hours to test his work over a month's period from 0307 to 0404 which would have taken a proficient PA3 less than 100 hours to complete.

3.    He did create and alter MFDs without supervision.

4.    Generally speaking from years of experience, he has trouble retaining general ARMS knowledge.

Plaintiff and Reeves worked together on the ARMS team for about fourteen years, and plaintiff agrees that Reeves was familiar with his work.

On January 24, 2000, in response to Goodwin's request for feedback, Reeves informed Goodwin that plaintiff had completed work on a recent project but that plaintiff was slow and took twice the time to complete a job than other team members.  Reeves stated that sometimes plaintiff's logic and problem solving were correct and sometimes way off base.  Reeves noted that he had given plaintiff easier assignments to ensure their successful completion.

The same day, Stranimier also responded to Goodwin's request for feedback about plaintiff and stated a variety of problems he had encountered with plaintiff.

In March 2000, Goodwin met with plaintiff to discuss on-going performance problems.

On July 10, 2000, Reeves informed Goodwin by e-mail of additional difficulties he had encountered with plaintiff.  Reeves' e-mail stated, in pertinent part:

My concern is not so much being somewhat tardy as it is him not understanding how to accomplish the changes required.  What took Paul, Pat, and Michael half the time

_____

[4] Reeves was born on November 11, 1947.

-8-

> took [plaintiff] twice as long because he used the wrong files and wrong reads to
> retrieve data for . . . processing.  I am more concerned about [plaintiff's]
> organizational and analytical skills.  I hate this but it's true.  I keep forgetting with
> each new project how much special tutoring he needs on our system and how easily he
> falls behind.

On July 28, 2000, Goodwin again met with plaintiff to discuss performance issues.  Goodwin addressed various concerns with plaintiff and told him that the rest of the team was frustrated by plaintiff's need for substantial support in his work, which should not have been required by someone at an SE III level.  Plaintiff testified that he did not believe the performance discussions that Goodwin had with him were motivated by his age.

On September 20, 2000, Reeves responded to another request from Goodwin about plaintiff's performance.  Reeves told Goodwin that in the past week he had responded to two questions from plaintiff that plaintiff should have been able to handle himself after so many years on the ARMS team.  In addition to the e-mailed information that Reeves provided to Goodwin, Reeves had numerous conversations with Goodwin during the years that Goodwin managed the ARMS team.  Reeves testified that, during the conversations, Reeves told Goodwin that plaintiff was slow, unable to retain information, frequently had to re-learn parts of the system, and became easily confused.  Reeves also told Goodwin that he and the other team leads had to spend a lot of time helping plaintiff, although plaintiff had been on the ARMS team longer than anyone else.  Reeves also told Goodwin that he and the other team leads frequently gave plaintiff the easiest jobs to try and avoid the substantial re-work that was often required for tasks assigned to plaintiff.  Reeves also had similar conversations with Stranimier.

Goodwin formally rated plaintiff as a 3 for performance year 2000 and plaintiff received a pay increase.  Goodwin commented that:

[Plaintiff] has completed his assignments, during his review period, as required.  He continues to require support from other team members when resolving recurring issues. [Plaintiff] is a team player, willing to work where his skills are needed.

Goodwin formally rated plaintiff a 3 for performance year 2001.  Goodwin told plaintiff that his advisory rating was an I (improvement needed).  The manager comments on plaintiff's 2001 LINK are virtually the same as the comments on his 1999 and 2000 LINKs.  Other members of the ARMS team received ratings as follows:

| Employee Name | Date of Birth | Formal Rating (2001) | Advisory Rating |
|---|---|---|---|
| Pat Mitchell | May 23, 1945 | 3 | E |
| Larry Reeves | November 11, 1947 | 3 | E |
| Paul Robinson | May 16, 1952 | 3 | E |
| Winston Wilson | September 27, 1956 | 3 | I |
| David Preston | February 22, 1957 | 3 | E |
| Kim Hunt | May 17, 1960 | 2 | E |
| Kelley White-Smith | February 21, 1961 | 3 | I |
| Matt Stranimier | August 21, 1962 | 2 | E |
| Shome Brata | January 12, 1963 | 3 | E |
| Hans Richardson | March 20, 1968 | 2 | M |
| Michael Starbuck | October 7, 1974 | 3 | H |
| Sadi Ozgen | January 1, 1975 | 3 – New Employee | E |
| Cashanita Conley | November 3, 1975 | 3 | S |

In January 2002, plaintiff received a favorable project evaluation from team lead Kelley White-Smith.

On August 19, 2002, ARMS team member Paul Robinson sent Goodwin the following e-mail:

> Sue, [plaintiff] was going to help me out with my Meetpoint programs. I gave him the task of creating the online programs to inquire and change the new Meetpoint interval table. I told him it was just like the IFOC interval table programs. It should have been a fairly simple process to copy the programs and map, make a few changes for the different file, program and map names. I really don't know what [plaintiff]'s process was, but at the time when we stopped working on Meetpoint, the work was still in process.

Goodwin contends that, throughout 2002, she continued to receive feedback from other members of the ARMS team that plaintiff was slow, committed errors, and could not retain information.

Goodwin rated plaintiff an L (less effective) for performance year 2002 and plaintiff received a pay increase. The comments on the final LINK included:

> [Plaintiff] does not consistently demonstrate the ability to effectively work at the level of an SE III. He also is unable to effectively multi-task. Any new task, outside of routine assignments, causes concern for [plaintiff]. He usually requires assistance from other team members when working on a new task. [Plaintiff] also struggles to understand and apply new concepts, techniques, and/or system functionality.
>
> . . .
>
> [Plaintiff] has completed his assignments, during this review period, as required. He has a great attitude towards his work assignments and his contribution to the success of the team. [Plaintiff] continues to work as a team player, willing to work where his skills can be of the most benefit to the overall success of the team. His level of integrity and commitment is one of his strongest assets.
>
> [Plaintiff] takes longer to complete tasks, and works longer hours to accomplish his tasks, than any other SE III on the team. He has the longest tenure supporting the ARMS Application than any other software engineer on the team. He needs to continue to address his written communication skills. His written communication needs to be more concise and professionally composed.

-11-

Goodwin assigned the following ratings to the other members of the ARMS team for performance year 2002.

| Employee Name | Date of Birth | Formal Rating (2002) |
|---|---|---|
| Pat Mitchell | May 23, 1945 | V |
| Paul McDonnell | November 18, 1946 | L |
| Larry Reeves | November 11, 1947 | H |
| Paul Robinson | May 16, 1952 | V |
| David Preston | February 22, 1957 | M |
| Kim Hunt | May 17, 1960 | V |
| Kelley White-Smith | February 21, 1961 | V |
| Matt Stranimier | August 21, 1962 | M |
| Shome Brata | January 12, 1963 | V |
| Hans Richardson | March 20, 1968 | H |
| Michael Starbuck | October 7, 1974 | H |
| Sadi Ozgen | January 1, 1975 | L |

Plaintiff contends that all but one of the ARMS team members under Goodwin's supervision who were under age forty received the highest LINK ratings (an M or an H) for 2002 and that all but one of the ARMS team members under Goodwin's supervision who were over age forty (including plaintiff) received the lowest LINK ratings (a V or an L) for 2002.  However, the record and the chart above reflects that at that time, eight of the thirteen ARMS team members were over age forty.  For performance year 2002, Goodwin rated five members of the ARMS team as H or M (the highest LINK ratings).  Of those five, three were age forty or over.

-12-

On January 9, 2003, Becker gave plaintiff a project evaluation for a project Becker led. Among other things, Becker indicated that plaintiff was a very conscientious employee and did whatever was needed to meet completion due dates. She noted, however, that plaintiff seemed to lack confidence in his decisions and that his team members seemed to pick on him.

On February 6, 2003, Becker delivered another project evaluation to plaintiff. Becker again noted that plaintiff was very conscientious and that it was a pleasure to work with plaintiff. She stated, however, that plaintiff needed to have quicker code turn around. She also stated that plaintiff was comfortable with a couple of areas but "struggles with all other areas of ARMS." In Becker's opinion, plaintiff worked hard to meet the deadlines for his projects, but he often spent too much time completing assigned tasks, frequently working late and/or on weekends. Becker reported this and other issues surrounding plaintiff's performance to Goodwin. Plaintiff disputes that he took too much time on tasks.

Defendant contends that, on many occasions plaintiff's hours caused the projects to be over budget. Plaintiff contends that he was never informed during his employment, either verbally or in writing, that his conduct caused any project to be over budget. Defendant further contends that, during the time that Becker was plaintiff's supervisor, no one else on the ARMS team consistently took longer on tasks than anticipated.

Goodwin testified that, throughout the time period she managed plaintiff, the team leads (Reeves, Mitchell, Becker, Stranimier, and White-Smith) repeatedly informed Goodwin of plaintiff's performance, including any performance problems.[5] Goodwin contends that she received, by far,

---

[5] Plaintiff objects throughout his summary judgment response to opinions asserted by defendant employees regarding his performance and the perception of his performance. Plaintiff contends that many statements in the asserted affidavits of defendant's employees contain

(continued...)

more complaints about plaintiff's performance than she received about the performance of any other member of the ARMS team.  According to Goodwin, the team leads consistently reported that they felt bad because plaintiff tried so hard and was always willing to work extra hours to complete the tasks.  Nevertheless, they and the rest of their teams expressed frustration at the amount of support plaintiff required and at having to teach plaintiff the same thing over and over again.

### E.      Corrective Action in 2003

In spring 2003, plaintiff worked on the ASR-26 project, on which Mitchell was the team lead. Mitchell testified that, in the course of supporting the production implementation of this project, plaintiff initiated a process that caused a production down situation (a shut down of the project). Mitchell contends that she had instructed plaintiff to analyze the production job and provide information to her, not to initiate the job.

Mitchell also had reported that plaintiff required a high level of support in order to complete the batch testing.  Mitchell also complained to Becker that it took plaintiff way too long to complete his parts of the project, and that plaintiff's time was causing the project to go over budget.  Mitchell testified that her comments about plaintiff's performance were nothing outside the ordinary comments she would make about members of the team.

---

[5](...continued)
inadmissible hearsay.  While the court acknowledges plaintiff's position on this issue, the court finds that defendant may set forth the opinions of its employees insofar as they explain defendant's attitude and opinions regarding plaintiff's performance leading up to and at the time of the termination.  The court makes no decision as to whether the stated opinions are true, but rather accepts them as defendant's perception of plaintiff's performance during the relevant time period.  "The relevant inquiry is not whether defendant's reasons for its . . . decisions were 'wise, fair or correct,' but whether defendant . . . 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1274 (D. Kan. 2002) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)); *Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1137-38 (10th Cir. 2004).

On May 29, 2003, Mitchell prepared an evaluation of plaintiff's performance on the ASR-26 project.  Mitchell's initial typewritten evaluation of plaintiff's performance on ASR-26 contained no negative comments.  Initially, Mitchell did not reference the implementation day problem because Mitchell had already addressed the issue with plaintiff, so she did not think she needed to include it.  The evaluation also did not mention the high level of support plaintiff required for batch testing.  Mitchell and Becker had met with plaintiff to discuss the evaluation the same day.

On June 5, 2003, Goodwin and Becker discussed the fact that Mitchell did not include the negative aspects of plaintiff's performance in the evaluation.  Because both Becker and Goodwin felt the issues were significant, they wanted Mitchell to document them.  Accordingly, they asked Mitchell to revise the evaluation form to reflect the implementation day problem.[6]

Mitchell then revised the form, and Becker and Mitchell met with plaintiff a second time to go over the updated evaluation and discuss the changes that were made.  Plaintiff did not dispute the statements in the revised evaluation.  However, plaintiff testified that he felt he did the right thing at the time with the information that he had.

Sometime shortly after this meeting, Goodwin and Becker suggested that plaintiff apply for a testing job.  Plaintiff did not want to apply for the job because it was temporary.  Plaintiff also testified that he was concerned he would not be entitled to severance if the temporary position was eliminated.

Plaintiff informed Goodwin and Becker that he was not comfortable applying for that job.  Goodwin responded that, in that case, she had no choice but to begin the corrective action process.

---

[6] It is uncontroverted that Mitchell did not think it was necessary to document the issue.  Mitchell testified that she was "asked to put it in there" because Goodwin "thought that everything should be fully documented and she – the concerns in all the areas – even though I had spoken to [plaintiff] about it, she thought it should be documented fully in the evaluation."

Defendant contends that plaintiff understood, from this conversation, that he was on a verbal warning. However, plaintiff testified that he was not placed on corrective action until later.

Becker testified that, pursuant to defendant's corrective action policy, employees may apply for other positions within defendant when they are on a verbal warning, but they may not apply for other jobs within defendant when they are on written warning. Becker also testified that, approximately two days after plaintiff was placed on verbal warning, she explained to plaintiff that she and Goodwin would likely place him on a written warning in the near future and urged plaintiff to apply for other jobs in other departments where he could be successful while he still had that opportunity. Becker provided plaintiff with a list of job openings.

On July 15, 2003, Goodwin and Becker placed plaintiff on written warning. In the written warning, Goodwin and Becker outlined plaintiff's performance deficiencies and set forth goals. The written warning stated that plaintiff must complete assignments in the amount of hours allocated, develop and distribute work without errors, and independently work on all assigned tasks. The written warning also stated that plaintiff would be placed on final written warning if he did not show improvement within thirty days.[7]

Thereafter, Becker began meeting with plaintiff on a regular basis and tracking his progress. During the week of July 21, 2003, plaintiff reported working only forty hours. Becker questioned this because she had seen plaintiff working late. Plaintiff told Becker he had worked more than eight hours per day on the days that he had meetings or a team building exercise. Becker's recollection is that plaintiff told her he recorded only forty hours because he did not think the other hours he worked were productive.

---

[7] Plaintiff points out that the thirty-day time frame was contrary to defendant's guidelines for the length of time an employee should be on corrective action.

-16-

Becker testified that, in late July, she continued to receive negative feedback from Mitchell regarding plaintiff's inability to complete tasks on his own and plaintiff's long hours, causing Mitchell's project to go over budget.  Plaintiff contends that Mitchell testified that she worked closely with plaintiff on a number of projects in 2003, including ASR-26 and ASR-27.  Mitchell testified that she worked with plaintiff until his termination and that she was surprised to hear of plaintiff's termination.  In fact, Mitchell testified that she did not believe plaintiff's performance warranted termination.

When Stranimier became plaintiff's supervisor in August 2003, he continued weekly meetings with plaintiff.  Stranimier also continued to document the meetings on the same document Becker had begun.  Stranimier contends that he continued to receive negative feedback from Mitchell regarding plaintiff's inability to follow directions.

When Goodwin and Becker administered the written warning to plaintiff, one of plaintiff's responses was that he was, in fact, an expert in certain areas of the ARMS application.  In order to give plaintiff an opportunity to demonstrate his knowledge, Goodwin and Becker asked plaintiff to choose a topic and give a presentation on that topic.  Plaintiff chose to present on an area called DLR because he believed he had expertise in it.

On August 14, 2003, plaintiff gave a presentation on DLR to Goodwin, Stranimier and Becker.  All three supervisors were critical of his performance and expressed their opinion that plaintiff's performance fell short of expectations.  In addition, plaintiff spent almost fourteen hours building release headers, a task that took most SE's on the ARMS team five to six hours.  Plaintiff disagreed with this assessment.

-17-

Defendant contends that, after evaluating plaintiff's presentation and reviewing the goals set out in his written warning, Goodwin and Stranimier did not believe plaintiff was meeting the goals set for him.  On August 15, 2003, Stranimier and Goodwin placed plaintiff on final written warning. Before administering the final written warning, Stranimier consulted with Rubye Beal in defendant's human resources department.

Defendant contends that, in late August 2003, plaintiff continued to make errors in his work and took significantly longer to complete tasks than anyone else on the team would take to complete the same tasks.  Plaintiff does not recall Stranimier discussing any of these issues with him.

Plaintiff was on vacation during the first two weeks of September 2003.  The following week, Stranimier again noted discrepancies in plaintiff's time, indicating that plaintiff was not recording all time spent.  Plaintiff does not recall Stranimier discussing these issues with him either.

Goodwin and Stranimier also gave plaintiff a second opportunity to demonstrate his knowledge by giving a presentation on September 25, 2003.  Plaintiff gave a presentation on batch functionality.  Goodwin and Stranimier were present at that presentation.   Stranimier recalled that plaintiff did not know the answers to several questions posed by Goodwin and Stranimier and gave erroneous answers to others.  Plaintiff testified that he believed he adequately understood the subject on which he gave the presentation.

### F.    Plaintiff's Termination

Defendant contends that, after reviewing his performance throughout August and September 2003, Goodwin and Stranimier determined that plaintiff was not sufficiently meeting the goals set forth in his warnings, and they decided to terminate plaintiff's employment.  Goodwin and Stranimier

informed plaintiff of the termination decision on October 3, 2003.  No one replaced plaintiff on the ARMS team.[8]

It is undisputed that plaintiff was over age forty at the time of his termination.[9]  At the time of his termination, plaintiff was the second oldest member of the ARMS team who was not a team lead. Plaintiff also had the second longest tenure of any member of the ARMS team.  Except for Robinson, all remaining SE IIIs on the ARMS team immediately after plaintiff's termination were substantially younger than plaintiff.  However, there were eight other employees on the ARMS team who were over age forty at that time.

After his termination, plaintiff wrote the following note on the bottom of a Testing Schedule "As soon as R5B C2P testing finished I was terminated.  The real reason for my termination due [sic] to workload."

### G.    Alleged Secret Evaluations

Plaintiff contends that, on May 21, 2003, when plaintiff was on verbal warning, Becker secretly rated plaintiff's work performance, his qualifications, and his demonstration of "the Sprint Dimensions."  Plaintiff further contends that, approximately twenty-six days later, on June 16, 2003, Goodwin did a similar rating of all members of the ARMS team.  Plaintiff argues that both Becker's and Goodwin's "secret" evaluation of plaintiff rated him on his technical proficiency on various development languages, operating systems, and applications and that in three areas (development languages, operating systems, and applications) plaintiff received the same ratings as several others under Goodwin's supervision.

---

[8] Both Goodwin and Stranimier were over age forty at the time of plaintiff's termination. Stranimier has never administered corrective action to anyone other than plaintiff.

[9] Plaintiff was age fifty at the time of his termination.

Defendant contends that there is no support for plaintiff's claim that Becker or Goodwin "secretly" rated plaintiff's performance.  While defendant admits that the spreadsheets were not public, defendant contends that the spreadsheets do nothing more than show that Becker's evaluation of plaintiff was slightly higher in some areas than in others.  Becker testified that she completed these evaluations for anyone who applied for a different job within defendant, and that much of the information on the spreadsheet was taken from plaintiff's own resume, which he provided to Becker.  It is undisputed that Becker was trying to help plaintiff find another job within defendant.  Moreover, defendant points out that the spreadsheet Goodwin prepared shows, as a whole, that plaintiff knew fewer development languages and applications than most other SE IIIs.

### G.    The ARMS Team After Plaintiff's Employment Ended

The functions of the ARMS team were, for the most part, outsourced in January 2004.  Since that time, defendant has employed only two people who work on the ARMS functions.  Other than Stranimier, the employees who remained on the ARMS team as of October 2003 either took other positions within defendant or took jobs outside of defendant.

### H.    Goodwin's Treatment of Other Employees

In 2003, eleven of the eighteen employees on the ARMS team were over age forty.  At the time of plaintiff's termination, four of the employees remaining on the ARMS team (Reeves, Mitchell, McDonnell, and Preston) were over age fifty (plaintiff's age), and nine of the thirteen remaining were over age forty.

The only other ARMS team employee that Goodwin has ever placed on corrective action is Cashanita Conley.  Goodwin placed Conley on written warning in 2002.  At the time, Conley was twenty-seven years old.  Conley resigned her employment at defendant shortly after she was placed on corrective action.

-20-

Another employee, Sadi Ozgen, received an overall performance rating of L (less effective) on his LINK from Goodwin for performance year 2002. At the time, he was twenty-seven years old.

Preston, who was over age fifty at the time plaintiff's employment ended and just four years younger than plaintiff, received the highest available rating from Goodwin on his 2002 LINK.

Reeves, who is older than plaintiff, and was over age fifty at the time plaintiff's employment ended, worked on the ARMS team for approximately fourteen years. Goodwin promoted Reeves from SE IV to SE V in 2000. Reeves received overall performance ratings of H (highly effective) on his LINKs from Goodwin for performance years 2002 and 2003. Reeves chose to leave defendant in January 2004 to go to work for the contractor that took over the functions of the ARMS team. Plaintiff contends that Reeves testified he took a position with the contractor because he knew his job was coming to an end.

Mitchell worked for defendant as a contractor in 2000. Goodwin asked Mitchell to convert to an employee in fall 2000, which Mitchell did. Mitchell received overall performance ratings of V (very effective) on her LINKs from Goodwin for performance years 2002 and 2003. Mitchell took a different position within defendant in March 2004. Mitchell obtained this new position based upon Goodwin's recommendation. Mitchell returned to the ARMS team in October 2004 at Goodwin's request. Mitchell still works for defendant and is now, once again, under Goodwin's supervision.

Defendant contends that McDonnell and Preston remained employed under Goodwin on the ARMS team until they voluntarily took other positions. Plaintiff contends that McDonnell was terminated in 2004 as part of a reduction in force.

**I.       Plaintiff's Evidence in Support of Discrimination**

-21-

Plaintiff recalls Goodwin telling him, in connection with a performance evaluation, that she believed he should know more given the amount of time he had been employed by defendant. Plaintiff also recalls Goodwin telling him on a performance evaluation that he had the most tenure of any software engineer on the ARMS team. These are the only comments plaintiff heard while he worked at defendant that he believes reflected an age bias.

The only adverse action of which plaintiff complains in this case is his termination. Plaintiff testified that he believes age was a factor in the decision to terminate his employment because he felt that employees who were going to retire were going to cost defendant money. Plaintiff does not have any facts on which to base his opinion, it is just his "feeling."

## III.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for

the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## IV.    Analysis

Plaintiff claims that defendant terminated his employment because of his age, in violation of the ADEA. Because plaintiff has offered no direct evidence of discrimination, the court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under the *McDonnell Douglas* framework, in order to survive summary judgment, plaintiff must first establish a prima facie case of discrimination. *Id.* If plaintiff carries that burden, defendant must then articulate a facially nondiscriminatory reason for the challenged employment action. *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). If defendant makes such a showing, the burden reverts to plaintiff to prove the proffered nondiscriminatory reason is pretextual

or that the termination decision was motivated by age discrimination.  *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

Defendant contends that plaintiff cannot meet his burden of proving the second or fourth elements of his prima facie case.  Plaintiff does not dispute that defendant has met its burden of offering a nondiscriminatory reason for his termination.  Accordingly, the court first turns to plaintiff's prima facie case.

### A.    Prima Facie Case

To establish a prima facie case of age discrimination, plaintiff must show that 1) he was within the protected age group at the time of the discharge; 2) he was performing satisfactory work; 3) he was discharged; and 4) his position was filled by a younger person.  *Rivera*, 365 F.3d at 920; *see also Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).  The Tenth Circuit has also replaced the fourth element of the prima facie case with "the adverse employment action occurred under circumstances giving rise to an inference of discrimination."  *Hysten v. Burlington Northern & Santa Fe Rwy. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).  "The real question . . . is whether a plaintiff has shown actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act."  *Id.*  Using the alternate fourth element essentially examines plaintiff's arguments in favor of pretext.

### 1.    Plaintiff's Work Performance

-24-

Based on the record before the court, the court finds that plaintiff has not met the second element of his prima facie case, that he was performing satisfactory work at the time of his termination.

Defendant does not dispute plaintiff's statement that he was qualified for employment when he began working for defendant. However, defendant contends that the requirements of plaintiff's job changed, as had defendant's management philosophy with regard to how it evaluated its employees. Plaintiff argues that he met the legitimate expectations of defendant by stating: "In the opinion of me and one other co-worker [Mitchell], I was meeting the legitimate expectations of my employer."

Defendant contends, and the court finds that the record demonstrates, that plaintiff was not performing up to the expectations of his employer at the time defendant terminated his employment. The record is replete with team leader comments and LINK evaluations demonstrating that, although plaintiff was a conscientious, hard worker, his skill level was not what defendant expected of an SE III. Although plaintiff has proffered Mitchell's testimony that she was surprised by his termination and saw no reason for it, Mitchell was not plaintiff's supervisor and did not evaluate his work performance as a whole. Moreover, it is undisputed that Mitchell herself had issues with plaintiff's work on at least one project to which he was assigned while she was a team lead.

Plaintiff must do more than allege that he believes he was meeting defendant's expectations or that other employees thought he was a good employee. In fact, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Wiemer v. Learjet Inc.*, 113 Fed. Appx. 887, 889 (10th Cir. 2004) (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996). The court will not substitute its business judgment for that of the employer. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse*

-25-

*Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). Moreover, the court recognizes that it must evaluate employers' decisions based upon the information available to them at the time the decision was made. *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001). Plaintiff has not demonstrated that he was performing satisfactory work at the time of his termination.

### 2.    Inference of Discrimination

With regard to the fourth element of his prima facie case and in support of his pretext claim, plaintiff points to the following in support of an inference of discrimination: 1) older workers on the ARMS team, including plaintiff, allegedly received generally lower performance ratings on their 2002 LINKs than younger employees on the ARMS team; 2) Greenwood, a younger employee on the ARMS team, also received an L (less effective) rating on his 2002 LINK but was not terminated; 3) two other older employees in Goodwin's group, McDonnell and Robinson, lost their jobs during a reduction in force in 2004; 4) plaintiff's fifteen years of satisfactory performance ratings and numerous merit raises; 5) Mitchell's testimony that she saw no conduct by plaintiff that she believed warranted his termination; 6) alleged "secret" ratings by Becker and Goodwin in May and June 2003; 7) alleged procedural irregularities in the length of time plaintiff was on written warning and final warning; 8) plaintiff's allegedly successful work for a contractor doing similar work; and 9) comments by Goodwin that plaintiff had the longest tenure as a software engineer on the ARMS team and that plaintiff should know more given the length of time he had worked for defendant.

Even considering all of plaintiff's allegations, the court finds no inference of discrimination in defendant's actions sufficient to meet the fourth element of the prima facie case. Addressing plaintiff's points in the order set forth above, first, as the court noted in the facts section of this Order, the evidence does not demonstrate that older workers on the ARMS team received generally lower

-26-

performance ratings on their 2002 LINKs than younger employees.  Further, as defendant has pointed out, the record is devoid of evidence that anyone – either younger or older – who was supervised by Goodwin and had similar performance problems was treated more favorably than plaintiff.  The undisputed evidence is that the only other ARMS team employee Goodwin has ever placed on corrective action was Cashanita Conley.  At the time, Conley was age twenty-seven.  Conley resigned prior to a decision being made about her employment.

Second, there is no evidence in the record that Goodwin gave Greenwood his review.  Goodwin testified that she did not know whether she gave the LINK rating for Greenwood for performance year 2002 because he worked in a different group for part of performance year 2002.  There is no evidence regarding Greenwood's performance after the 2002 LINK.  In fact, the only evidence regarding Greenwood's performance in the record besides the 2002 LINK rating is that Greenwood moved to another department in 2003.  The only person in the record who received an L rating from Goodwin (besides plaintiff) is Sadi Ozgen.  Ozgen left defendant shortly after receiving that rating.  Greenwood's evaluation is insufficient to create an inference of discrimination.

Third, defendant has asserted, and plaintiff has not controverted, that neither Goodwin nor Stranimier had anything to do with the reduction in force decisions that impacted McDonnell and Robinson.  In fact, McDonnell and Robinson were working in totally separate groups.  The Tenth Circuit recognizes that a decision made by a different supervisor "diminishes the evidentiary value of the comparison."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000).  Defendant contends that Goodwin did not make any decisions regarding McDonnell and Robinson, and the record does not show otherwise.  In the absence of any facts that make McDonnell and Robinson's situation comparable to plaintiff's, the court finds no inference of discrimination in their termination of employment during a subsequent reduction in force.

-27-

Fourth, plaintiff's evidence regarding his fifteen years of satisfactory performance ratings and numerous merit raises does not change the specific facts about defendant's concerns regarding, and dissatisfaction with, plaintiff's performance during the last two years of his employment. "Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Perry v. St. Joseph Reg'l Med. Ctr*, 110 Fed. Appx. 63, 68 (10th Cir. 2004) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992)). Moreover, plaintiff has not disputed that defendant's expectations changed and became more difficult for him to meet in the few years prior to his termination. Plaintiff's evidence of his prior good performance evaluations, in light of the extensive record of the performance issues that defendant documented during the last few years of plaintiff's employment, especially after the LINK rating system changed, does not create an inference of age discrimination in defendant's termination decision.

Fifth, with regard to plaintiff's proffer of Mitchell's positive view of his performance, as the court previously noted with regard to the second element of plaintiff's prima facie case, plaintiff must do more than allege that he believed he was meeting defendant's expectations or that other employees thought he was a good employee. In fact, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Wiemer*, 113 Fed. Appx. at 889 (quoting *Furr*, 82 F.3d at 988). Mitchell was not plaintiff's supervisor and did not evaluate his work performance as a whole. The court recognizes that it must evaluate defendant's decision based upon the information available to it, in this case Goodwin and arguably Stranimier, at the time the decision was made. *Watts*, 270 F.3d at 1295. The court "looks at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231. As a team lead, Mitchell undeniably worked with plaintiff and had the

ability to form opinions of his performance. She did not have the same information as Goodwin and Stranimier. She did not review evaluations from other team leads. Accordingly, plaintiff's proffer of Mitchell's supportive testimony does not create an inference of discrimination.

Sixth, with regard to the alleged "secret" evaluations performed by Goodwin and Becker, the court noted in the fact section of this Order that, while defendant admits that the spreadsheets were not public, the spreadsheets do nothing more than show that Becker's evaluation of plaintiff was slightly higher in some areas than in others. Becker testified that she completed these evaluations for anyone who applied for a different job within defendant, and that much of the information on the spreadsheet was taken from plaintiff's own resume, which he provided to Becker. It is undisputed that Becker was trying to help plaintiff find another job within defendant. Moreover, defendant points out that the spreadsheet Goodwin prepared shows, as a whole, that plaintiff knew fewer development languages and applications than most other SE IIIs. The court finds nothing supporting an inference of discrimination in the spreadsheets prepared by Goodwin and Becker.

Seventh, the record reflects that fewer than eighty days passed between plaintiff's first formal corrective action and his termination, which plaintiff argues demonstrates evidence of "procedural irregularities" and casts doubt upon the reasons for his termination. Plaintiff contends that defendant's own written guidelines set forth much longer periods of time to allow an employee, much less a "long-tenured" employee such as plaintiff, to improve his performance.

The human resources manager assigned to the ARMS team in the period at issue was Rubye Beal. Beal testified in her deposition that thirty days is a good measure to see if an individual is improving. Beal also testified that there is no average period of time for a particular stage of corrective action, but that the time period is driven by particular situations, and each case will be different.

-29-

The court finds that the fact that the corrective action policy gave longer periods as examples does not suggest any procedural irregularities.  Defendant's corrective action guidelines provided that time frames for improvement would be based on individual circumstances and directed managers to human resources for assistance.  There is no evidence that Goodwin or Stranimier were even aware of the examples.  The record demonstrates that they relied on Beal, which was permissive under the policy.  Moreover, as defendant has pointed out, Goodwin also gave twenty-seven-year old Conley only thirty days to improve after her written warning.  Both plaintiff's and Conley's written warnings indicated that they would be placed on final written warning if their performance did not improve in thirty days.  Accordingly, the court finds no evidence of procedural irregularities that create an inference of discrimination.

Eighth, plaintiff contends that, following his termination, he obtained a temporary assignment with a contractor performing testing work at defendant.  Plaintiff contends that he successfully performed testing services – work very similar to the work he performed while on the ARMS team – for a period of several weeks while a full-time employee of the contractor took medical leave.  Plaintiff argues that this casts doubt on defendant's contention that it terminated him for poor performance.  However, other than plaintiff's self-serving statements, there is absolutely no evidence in the record that plaintiff was "successful" at his contractor job at defendant or that anyone at defendant evaluated his work performed for the contractor.  Plaintiff's own self-serving testimony is insufficient to create an inference of discrimination surrounding defendant's termination decision.

Finally, with regard to the comments that Goodwin made that plaintiff had the longest tenure as a software engineer on the ARMS team and that plaintiff should know more given the length of time he had worked for defendant, the court finds that these comments are unrelated to plaintiff's age.  Plaintiff worked on the ARMS team for more than a decade.  Given his experience on the ARMS

team, plaintiff should have been able to handle complex issues.  The record, through Goodwin's, Stranimier's, Becker's and other team lead's evaluations, is uncontroverted that this was not the case. The court finds no reference to plaintiff's age in the comments that Goodwin made or by any of defendant's employees who commented on plaintiff's performance.  Taken in context, it appears that Goodwin was simply commenting on the level of plaintiff's skills in comparison to the length of time he had worked on the ARMS team.  Goodwin made no reference to plaintiff's age, and the court finds no inference of discrimination in Goodwin's comments.

> **B.      Pretext**

To establish pretext, plaintiff must show that defendant's explanation for its actions is unworthy of credence or that defendant was motivated by a discriminatory reason in its actions.  *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994) (citation omitted).  Plaintiff need not demonstrate unequivocally that defendant's explanation was false.  *Id.* (citation omitted).  It is also unnecessary to show that "age was the sole motivating factor in the employment decision."  *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1170 (10th Cir. 1985).  However, plaintiff must make some showing "that age actually played a role in the defendant's decisionmaking process and had a determinative influence on the outcome."  *Rea*, 29 F.3d at 1455 (citation omitted).

Although plaintiff does not dispute that defendant has met its exceedingly light burden to proffer a nondiscriminatory reason for his termination, the court finds it unnecessary to conduct the pretext analysis because plaintiff has failed to establish all of the elements of his prima facie case.  As the court noted previously, plaintiff has failed to establish that defendant's actions created an inference of discrimination sufficient to avoid summary judgment.  Moreover, the relevant inquiry in analyzing the pretext prong is not whether the "proffered reasons were wise, fair or correct, but whether [defendant] honesty believed those reasons and acted in good faith upon those beliefs."

*Exum*, 389 F.3d at 1137-38.  Even considering the evidence in a light most favorable to plaintiff,
given the overwhelming record of plaintiff's performance problems, the court finds Goodwin's and
Stranimier's beliefs in making the decision to terminate plaintiff's employment were credible.  While
it appears that Goodwin and Stranimier (and the rest of the ARMS team) liked plaintiff on a personal
level, they believed that terminating plaintiff's employment was the best business decision.  The
court does not "act as a 'super personnel department' that second guesses employers' business
judgments."  *Simms*, 165 F.3d at 1330.

     **IT IS THEREFORE ORDERED** that defendant's Motion to Strike Declaration of Stephen
J. Dennis (Doc. 70) and defendant's Motion for Summary Judgment (Doc. 60) are granted.

     Dated this ____ day of December 2005, at Kansas City, Kansas.

                      **S/Carlos Murguia**
                      **CARLOS MURGUIA**
                      **United States District Judge**